# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT LYATHAUD, Individually and on Behalf of all Others Similarly Situated,<br><br>                              Plaintiff,<br><br>    vs.<br><br>LINCOLN EDUCATIONAL SERVICES CORP., DAVID F. CARNEY, SHAUN E. McALMONT and CESAR RIBEIRO,<br><br>                      Defendants | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, among other things, his counsel's investigation regarding Lincoln (defined below), including without limitation review and analysis of filings made by Lincoln with the United States Securities and Exchange Commission ("SEC"), press releases by the Company, and news articles.

## <u>INTRODUCTION</u>

1.     This is a federal class action on behalf of purchasers of the common stock of Lincoln Educational Services Corp.  ("Lincoln" or the "Company") between March 13, 2009 and August 5, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  As alleged herein, defendants published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded

33923v1

were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

## <u>OVERVIEW</u>

2.      Throughout the Class Period, defendants issued a series of materially false and misleading statements regarding Lincoln's compliance with governmental regulations, and the growth and foreseeable profitability of Lincoln.

3.      Defendants' Class Period statements were materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

- Lincoln was not compliant with government regulations under Title IV.

- Defendants had propped up the Company's results by fraudulently inducing students to enroll in Lincoln's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained.

- Defendants materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects.

- Lincoln did not have adequate systems of internal operational or financial controls, such that Lincoln's reported operational statements and foreseeable growth prospects were true, accurate, or reliable.

4.      During the Class Period, Defendant Carney sold almost $6 million of his privately held Lincoln shares while in possession of material, adverse, non-public information about the Company.

5.      It was only on August 5, 2010, however, that investors learned the truth about Lincoln after the Company announced that it was changing its recruitment standards and could

33738v1                                    2

no longer maintain its growth expectations.  This came right on the heels of the United States General Accounting Office's ("GAO") report concluding that for-profit educational institutions like Lincoln had engaged in an illegal and fraudulent course of action designed to recruit students and over-charge the federal government for the cost of such education.  The August 5th release implicated Lincoln's compliance with governmental regulations in that Lincoln's sudden change on reported recruited students for the upcoming quarter came right after the government findings of wrongdoing concerning such recruitment.  Following these disclosures, shares of the Company fell over $4.30, or 20% in a single trading day, on unusually high trading volume.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Lincoln maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

9.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff Robert Lyathaud, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Lincoln at artificially inflated prices during the Class Period and has been damaged thereby.

11.     Defendant **LINCOLN EDUCATIONAL SERVICES CORP.**  is a corporation organized under the laws of the state of New Jersey, which maintains its principal place of business at 200 Executive Drive - Suite 340, West Orange, NJ 07052.  According to the Company's profile listed on Yahoo.com/finance, Lincoln provides career-oriented post-secondary education services in the United States.  It offers degree and diploma programs for high school graduates and working adults in health sciences, automotive technology, skilled trades, hospitality services, and business and information technology.  As of December 31, 2009, the Company reported 29,340 students enrolled in its programs; and operated 43 campuses in 17 states under the names of Lincoln Technical Institute, Lincoln College of Technology, Lincoln College of New England, Nashville Auto-Diesel College, Southwestern College, Clemens College, and Euphoria Institute of Beauty Arts and Sciences.

12.     Defendant **DAVID F.  CARNEY** ("Carney") is, and during the Class Period was, Executive Chairman and Chairman of the Executive Committee and a member of the Board of Directors of the Company.

13.     Defendant **SHAUN E.  McALMONT** ("McAlmont") is, and during the Class Period was, President and Chief Executive Officer of the Company.  During the Class Period, defendant McAlmont certified the Company's Form(s) 10-Q.

14.     Defendant **CESAR RIBEIRO** ("Ribeiro") is, and during the Class Period was, Chief Financial Officer, Principal Accounting Officer, and Senior Vice President of the

33738v1                                         4

Company.  During the Class Period, defendant Ribeiro certified the Company's Form(s) 10-Q and signed the Company's 2008 Form 10-K.

15.     The defendants referenced above in ¶¶12-14 are referred to herein as the "Individual Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lincoln's quarterly and annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

17.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Lincoln common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Lincoln's business, operations, management and the intrinsic value of Lincoln common stock; (ii) enabled defendants to artificially inflate the price of Lincoln shares; (iii) enabled Defendant Carney to sell millions of dollars of his privately held Lincoln shares while in possession of material adverse non-public

33738v1                                        5

information about the Company; and (iv) caused Plaintiff and other members of the Class to purchase Lincoln common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Lincoln between March 13, 2009 and August 5, 2010, inclusive (the "Class"), and who were damaged thereby.   Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lincoln common shares were actively traded on the Nasdaq.  As of May 4, 2010, the Company had over 26.044 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lincoln or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Lincoln; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient djudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading Statements Made During the Class Period

24.     On March 13, 2009, Lincoln issued its annual report for 2008 on Form 10-K, which was signed by Defendant Ribiero.  The report stated, in part:

Students attending our schools finance their education through a combination of family contributions, individual resources, private loans and federal financial aid programs. Each of our schools participates in the federal programs of student financial aid authorized under the Title IV Programs, which are administered by the DOE [Department of Education]. For the year ended December 31, 2008, approximately 79% (calculated based on cash receipts) of our revenues were derived from the Title IV Programs. Students obtain access to federal student financial aid through a DOE prescribed application and eligibility certification process. Student financial aid funds are generally made available to students at prescribed intervals throughout their predetermined expected length of study. Students typically use the funds received from the federal financial aid programs to pay their tuition and fees. The transfer of funds from the financial aid programs are to the student, who then applies those funds to the cost of his or her education.

In connection with the students' receipt of federal financial aid, our schools are subject to extensive regulation by governmental agencies and licensing and accrediting bodies. In particular, the Title IV Programs, and the regulations issued thereafter by the DOE, subject us to significant regulatory scrutiny in the form of numerous standards that each of our schools must satisfy in order to participate in the various federal student financial aid programs. To participate in the Title IV Programs, a school must be authorized to offer its programs of instruction by the applicable state education agencies in the states in which it is physically located, be accredited by an accrediting commission recognized by the DOE and be certified as an eligible institution by the DOE. The DOE will certify an institution to participate in Title IV Programs only after the institution has demonstrated compliance with the Higher Education Act of 1965, as amended, or HEA, and the DOE's extensive regulations regarding institutional eligibility. The DOE defines an eligible institution to consist of both a main campus and its additional locations, if any. Each of our schools is either a main campus or an additional location of a main campus. Each of our schools is subject to extensive regulatory requirements imposed by state education agencies, accrediting commissions, and the DOE. Because the DOE periodically revises its regulations and changes its interpretations of existing laws and regulations, we cannot predict with certainty how Title IV Program requirements will be applied in all circumstances. Our schools also participate in other federal and state financial aid programs that assist students in paying the cost of their education.

25.     On March 3, 2010, defendants published a release announcing purported results for the full year 2009, ended December 31, 2009, and providing purported guidance for fiscal year 2010.  This release also stated, in part, the following:

33738v1                                          8

Lincoln Educational Services Corporation Reports Record Fourth Quarter and 2009 Year End Results

WEST ORANGE, N.J., Mar 03. 2010 (BUSINESS WIRE) -- Lincoln Educational Services Corporation (Nasdaq: LINC) ("Lincoln") today reported record fourth quarter and 2009 year end results.

Highlights:

Quarterly -

Record revenue of $157.5 million for the fourth quarter of 2009, representing an increase of 46.7% from $107.3 million for the fourth quarter of 2008.

Record diluted EPS from continuing operations of $0.82 for the fourth quarter of 2009, representing an increase of 65.2% from $0.49 for the fourth quarter of 2008.

Student starts increased by 31.8% as compared to the fourth quarter of 2008.  On a same school basis, student starts increased 25.0% as compared to the fourth quarter of 2008.

Average student population increased by 40.1% as compared to the fourth quarter of 2009.  On a same school basis, average student population increased 26.5% as compared to the fourth quarter of 2008.

Yearly -

Record revenue of $552.5 million for the year ended December 31, 2009, representing an increase of 46.6% from $376.9 million for the year ended December 31, 2008.

Record diluted EPS of $1.82 for the year ended December 31, 2009, representing an increase of 133.8% from $0.78 for the year ended December 31, 2008.

Student starts increased by 37.2% as compared to the year ended December 31, 2008.  On a same school basis, student starts increased 26.7% as compared to the year ended December 31, 2008.

Student population at December 31, 2009 increased 35.4% to 29,340 from 21,667 at December 31, 2008.  Student population, on a same school basis increased 25.0% to 26,399 at December 31, 2009 from 21,116 at December 31, 2008.

26.     This release also provided purported "guidance" for 2010, in part, as follows:

2010 Guidance -

Revenue of $645 million to $655 million, up 17% to 19% over 2009.

Diluted EPS of $2.40 to $2.50, representing growth of 32% to 37% over 2009.

Increase in expected student starts of 13% to 15% over 2009.

For the first quarter of 2010, we expect revenues of $145.0 million to $147.0 million, representing an increase of approximately 23% over the first quarter of 2009, and diluted EPS of $0.38 to $0.41, representing an increase of approximately 80% over the first quarter of 2009.  Guidance for the first quarter of 2010 is based on an expected increase in student starts of 18% to 20% over the same period in 2009.

27.     In addition to the foregoing, the March 3, 2010, release also quoted defendant

Carney, in part, as follows:

Comment and Outlook

"Our fourth quarter marked the culmination of an outstanding year for Lincoln. For the fourth quarter and the year we achieved record revenue, operating income, net income, and enrollment growth.  We finished the year with 29,340 students or approximately 7,650 students ahead of the prior year.  Strong start growth during the year resulted in increased capacity utilization which produced meaningful margin expansion.  For 2009, our operating margin increased to 16.0% up 655 basis points from an operating margin of 9.4% for the year ended December 31, 2008.  With respect to 2010, we expect that we will continue to see leverage in our business model, as we benefit from the approximately 7,650 additional students coupled with some moderation in our expectation of student start growth," said David Carney, Lincoln's Executive Chairman.   "The strategic investments we have made in our business over the last several years produced meaningful results in 2009.   Those investments, combined with the recent formation of the Lincoln Collegiate Group, will enable us to deliver online regionally accredited bachelor's degrees, and deliver continued growth for 2010 and beyond."

Mr.  Carney added, "As most of you are probably aware, the current negotiated rulemaking process under the Higher Education Act has produced consensus on 9 of the 14 issues being deliberated.  One of the remaining actively contested open issues centers on the definition of 'gainful employment' and the Department of Higher Education's ("DOE") proposed language, which ties the definition of gainful employment to a debt to income ratio based on starting salaries.  We believe the DOE's focus on quality speaks to our core strengths and is consistent with our stated mission, which is centered on providing our students a high return on their educational investment.  However, we believe the definition of gainful employment as proposed by the DOE is problematic in its current draft form.  We

believe the regulation as currently proposed would lead to unintended consequences, and would ultimately hurt the students that need the education the most. Moreover, the draft regulation focuses only on starting salaries and doesn't address the benefits and earnings potential of a student over his career."

Mr. Carney concluded, "However, even in the unfortunate event that the proposed regulation is not altered or amended, as we expect it will be, we anticipate that this regulation would be manageable for Lincoln. Based on our current enrollment and program mix, we estimate that, before we make any modifications to our programs, the regulation as proposed, would have impacted less than 5% of our revenues in 2009."

28.     As shares of Lincoln continued to trade at artificially inflated levels, on March 11, 2010, defendants filed with the SEC the Company's 2009 Form 10-K, for the year ended December 31, 2010, signed by defendant Riberio and certified by defendants Ribeiro and McAlmont. In addition to making substantially similar statements concerning the Company operations as had been published previously, the 2009 Form 10-K also provided statements concerning the Company's Controls and Disclosure Procedures, in part, as follows:

ITEM 9A.  DISCLOSURE CONTROLS AND PROCEDURES

Evaluation of disclosure controls and procedures

Our Chief Executive Officer and Chief Financial Officer, after evaluating, together with management, the effectiveness of our disclosure controls and procedures (as defined in Securities Exchange Act Rule 13a-15(e)) as of December 31, 2009, have concluded that our disclosure controls and procedures are effective to reasonably ensure that material information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended is recorded, processed, summarized and reported within the time periods specified by Securities and Exchange Commissions' Rules and Forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

29.     In addition to the foregoing, the Company's 2009 Form 10-K also contained certifications by defendants Ribeiro and McAlmont that attested to the purported accuracy and completeness of the Company's disclosures, as follows:

## CERTIFICATION

1.      I have reviewed this Annual Report on Form 10-K of Lincoln Educational Services Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an Annual Report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 11, 2010

/s/ Shaun E.  McAlmont
Shaun E.  McAlmont
President and Chief Executive Officer

*       *       *

Date: March 11, 2010

/s/ Cesar Ribeiro
Cesar Ribeiro
Chief Financial Officer

*       *       *

## <u>CERTIFICATION</u>

**Pursuant to 18 U.S.C. 1350 as adopted by
Section 906 of the Sarbanes-Ox1ey Act of 2002**

Each of the undersigned, Shaun E.  McAlmont, President and Chief Executive Officer of Lincoln Educational Services Corporation (the "Company"), and Cesar Ribeiro, Chief Financial Officer of the Company, has executed this certification in connection with the filing with the Securities and Exchange Commission of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2009 (the "Report").

Each of the undersigned hereby certifies that, to his respective knowledge:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:   March 11, 2010

33738v1                                   13

/s/ Shaun E.  McAlmont
Shaun E.  McAlmont
President and Chief Executive Officer

/s/ Cesar Ribeiro
Cesar Ribeiro
Chief Financial Officer

30.     The statements made by defendants in paragraphs 24 to 29 were materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

- Lincoln was not compliant with government regulations under Title IV.

- Defendants had propped up the Company's results by fraudulently inducing students to enroll in Lincoln's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained.

- Defendants materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects.

- Lincoln did not have adequate systems of internal operational or financial controls, such that Lincoln's reported operational statements and foreseeable growth prospects were true, accurate, or reliable.

31.     **"Record" I Q:10 Results Announced**.  On May 5, 2010, defendants published a release announcing purported "Record" setting results for the first quarter of 2010, the period ended March 31, 2010.  This release also stated, in part, the following:

Lincoln Educational Services Corporation Reports Record First Quarter Results

Lincoln Generates Record First Quarter Revenue, Operating Income and EPS

Average Student Population Increases 25.1 Percent; Student Starts Grow 19.3 Percent Lincoln Raises EPS Outlook for 2010

WEST ORANGE, N.J., May 5, 2010 (GLOBE NEWSWIRE) -- Lincoln Educational Services Corporation (Nasdaq:LINC) (Lincoln), a leading provider of

33738v1                                      14

diversified career-oriented post-secondary education, today reported record first quarter results.

First Quarter 2010 Highlights

Revenue grew 28.6 percent to $152.5 million from $118.6 million in the prior-year quarter.

Operating income rose 136.9 percent; operating profit margin improved 760 basis points.

Diluted earnings per share grew 150.0 percent to $0.55.

Student starts increased 19.3 percent.

Average student population rose 25.1 percent.

Cash flow from operations increased significantly to $21.2 million.

32.     In addition to the foregoing, the May 5, 2010 release again quoted defendant

Carney, in part, as follows:

> "We delivered an outstanding quarter and generated record first quarter results," said David Carney, Lincoln's Executive Chairman.  "Clearly, we demonstrated the ability to execute our strategies and to continue the strong momentum we have built in recent years.

> "Although our first quarter expenses were favorably impacted by certain timing items, we generated record results that were driven by continued strong growth in average student population and student starts.  Our performance was led by our marketing and admissions efforts and reflects our ability to leverage our business model.

> "We delivered strong enrollment growth in the first quarter of 2010 and these gains were broad-based across our five verticals," stated Mr.  Carney.  "We continued to experience healthy demand for our programs and early indications are that our important high school season is tracking ahead of last year.  We expect these trends will position us well to continue our strong momentum in 2010 and beyond."

33.     This release also provided purported guidance for second quarter and the

remainder of 2010, in part, as follows:

> Outlook

"We are raising our earnings outlook for 2010," said Mr. Carney. "We continue to expect student starts to grow 13 to 15 percent this year. Our strong increase in student starts during the last several quarters allowed us to take a more selective approach to our admission standards. This approach was reflected in our prior outlook. Over time we expect these actions will reduce our start growth, but will result in higher retention, improved student outcomes and higher placement rates, as well as lower bad debt expense and default rates."

For the full year 2010, we now expect revenue to range from $650 to $655 million. Student starts are expected to increase 13 to 15 percent. Diluted earnings per share are expected to range from $2.50 to $2.60, which would be an increase of 37 to 43 percent from the $1.82 we earned in 2009.

For the second quarter of 2010, we expect revenue to range from $151 to $153 million. Student starts are expected to grow 8 to 10 percent. Diluted earnings per share are expected to range from $0.42 to $0.45, which would be an increase of 56 to 67 percent from the $0.27 earned in the second quarter of 2009.

34.     As shares of Lincoln continued to trade at artificially inflated levels, on May 7, 2010, defendants filed with the SEC the Company's 1Q:10 Form 10-Q, for the first quarter ended March 31, 2010, signed by defendant Ribeiro and certified by defendants Ribeiro and McAlmont. In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously, the 1Q:10 Form 10-Q also provided statements concerning the Company's purported Controls and Disclosure Procedures, in part, as follows:

### Item 4.  CONTROLS AND PROCEDURES

(a) *Evaluation of disclosure controls and procedures*. Our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Securities Exchange Act Rule 13a-15(e)) as of the end of the quarterly period covered by this report, have concluded that our disclosure controls and procedures are adequate and effective to reasonably ensure that material information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by Securities and Exchange Commissions' Rules and Forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

35.     Similar to the Company's 2009 Form 10-K, the Company's 1Q:10 Form 10-Q also contained certifications by defendants Ribeiro and McAlmont, that attested to the purported accuracy and completeness of its disclosures.

36.     The statements made by defendants and contained in the Company's May 5, 2010, release and in the Company's I Q:10 Form 10-Q were materially false and misleading when made, and were known by defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein in ¶30, supra.

37.     As shares of the Company continued to trade around $25.00 per share, on May 19, 2010, defendants McAlmont and Ribeiro appeared and presented, on behalf of the Company, at the Baird 2010 Growth Conference in Chicago, Illinois.  At this conference, defendants again purported to guide investors as to Lincoln's growth strategies, financial performance, and near-term outlook.  Continuing defendants' efforts to inflate and maintain the price of Company stock, on May 25, 2010, defendants McAlmont and Ribeiro also presented at the Bank of America Merrill Lynch 2010 Services Conference.

## THE TRUE OPERATIONAL CONDITION OF
## LINCOLN IS BELATEDLY REVEALED

38.     Beginning on August 3, 2010, reports began to circulate that questioned the legitimacy of the means by which for-profit education providers, such as the Company, recruited students.  While no names were initially provided, that day, the GAO published a report finding that: (i) certain for-profit schools used deceptive recruiting practices; (ii) certain for-profit schools substantially inflated their tuition costs; and (iii) certain for-profit schools engaged in other "troubling" practices.  Accordingly, that day, Reuters reported, in part, the following:

33738v1                                    17

WASHINGTON, Aug 3 (Reuters) - U.S. government investigators found that for-profit colleges encouraged fraudulent practices and made deceptive statements to prospective students, according to a study released on Tuesday.

Investigators from the Government Accountability Office posed as students and applied for admission at 15 for-profit colleges across the United States.  School personnel encouraged GAO staff to falsify financial aid forms, misled them about costs and gave false information about accreditation.

*** 

GAO's investigators also found that tuition at the for-profit colleges was "substantially more" than for comparable programs at nearby public colleges, but often misled prospective students about total costs.

The study found that a massage therapy program certificate cost $14,000 at a for-profit college but was just $520 at a local community college.

The Career College Association, an organization of mostly for-profit occupational colleges, said in a statement that the GAO report "is deeply troubling" and vowed to strengthen its members' compliance with regulations.

*** 

Investigators found that on average, tuition for an associate's degree was between 6 and 13 times as much at a for-profit school than at a nearby public college.  The average of the for-profit schools investigated was $33,467, compared to just over $4,000 for public schools.

A bachelor's degree at a for-profit college averaged $55,000, almost twice as expensive as local public institutions.

*** 

The GAO findings add to pressure the industry, which has already faced a crackdown by the Obama administration.

The U.S. Department of Education proposed rules on July 22 that would force for-profit schools to show their former students are either paying off their loans or are capable of doing so.

39.     Similarly, on August 4, 2010, cable news network, CNBC, also published a report

on its website that stated, in part, the following:

GAO Finds For-Profit Schools Encouraged Fraud

An investigation by the Government Accountability Office (GAO) contends that for-profit colleges encouraged fraud and engaged in deceptive and questionable marketing practices.

The investigation is part of a detailed report released this morning in conjunction with testimony before the Senate Committee on Health, Education, Labor and Pensions by Gregory Kutz, the GAO's managing director of forensic audits and special investigations.

*** 

Kutz made it clear he believed the company's findings suggested the practices were widespread throughout the industry, suggesting to some industry observers that legislators are likely to more tightly regulate the industry.

*** 

Meanwhile Harris Miller, president of the Career College Association, told me the findings are "disturbing." And while the report was expected, "It's hard to put lipstick on a pig.  To have four schools have financial aid officers that are advising students to misrepresent their financial situation is totally unacceptable. The necessity to focus on compliance has to be elevated."

40.    Also on August 4, 2010, Senator Durbin, Assistant Majority Leader, posted in

part the following on his official website at http://durbin.senate.izov/showRelease.cfm? release

Id=326961:

DURBIN, WEBB TAKE CONCERNS ABOUT FOR-PROFIT COLLEGES TO V.A. AND D.O.D.

Wednesday, August 4, 2010

[WASHINGTON, D.C.] - Concerned about reports of some for-profit colleges aggressively targeting military personnel and veterans, U.S. Senators Dick Durbin (D-IL) and Jim Webb (D-VA) today asked the Secretaries of the Department of Veterans Affairs, Eric Shinseki, and the Department of Defense, Robert Gates, for detailed information on how veteran and military tuition assistance program funding is being spent.

Specifically, Durbin and Webb asked for data on the tuition assistance used for education at for-profit colleges and the standards in place to ensure that veterans, service members and their families are given the best possible options for higher education and that taxpayer funding is being well-spent.

"Some for-profit colleges serve VA beneficiaries [and active duty students and their families] well by offering flexible course schedules, distance learning, and course credit for military training," the Senators wrote.  "But we have heard reports that some for-profit institutions may be aggressively targeting service members and veterans, signing them up for educational programs that may bring little benefit to future employment opportunities, low graduation rates and high default rates.  Finally, with the recent passage of the Post 9/11 GI Bill, which provides for tuition reimbursement, we have heard concerns about excessive tuition being charged at some of these institutions."

In 2008, Congress passed the Post-9/11 GI Bill, hallmark legislation introduced by Senator Webb on his first day in office, to provide veterans with comprehensive educational benefits on par with the World War II-era GI Bill. More than 34,000 beneficiaries took advantage of the program in fall 2009 - the first year funding was available.  Seven of the top ten recipients of Post-9/11 GI Bill funding were for-profit schools.

The United States began providing education benefits to veterans and members of the military in 1944, as part of the Servicemen's Readjustment Act, which was the origin of the GI Bill.  Many of these educational opportunities are free or at reduced cost, and offer the flexibility necessary for service members subject to short-notice, worldwide deployments.  In 2009, the Department of Defense spent $424 million on tuition assistance and the Department of Veterans Affairs spent $3.58 billion.

On June 21, Durbin joined with other lawmakers in asking the GAO to assess the quality of for-profit institutions, as well as how much of their revenue is comprised of Federal student aid and other Federal funding sources.  Other Senators signing on to today's letter include: Senators Tom Carper (D-DE), Kay Hagan (D-NC), Claire McCaskill (D-MO), Russ Feingold (D-WI) and Tom Harkin (D-IA).

    41.    As a result of the GAO not naming the companies engaged in such fraudulent and deceptive registration practices, and because the Company made no adverse disclosures at that time, shares of Lincoln continued to trade above $20.00 on August 3 and 4, 2010.

    42.    On August 5, 2010, however, the Company published the following press release, after which Lincoln shares fell by 20%:

    Lincoln Educational Services Corporation Reports Second Quarter Results

    Lincoln Generates Strong Second Quarter Revenue, Operating Income and EPS

Average Student Population Increases 17.6 Percent

WEST ORANGE, N.J., Aug. 5, 2010 (GLOBE NEWSWIRE) -- Lincoln Educational Services Corporation (Nasdaq:LINC) (Lincoln), a leading provider of diversified career-oriented post-secondary education, today reported second quarter results.

Second Quarter 2010 Highlights

  -- Revenue grew 19.3 percent to $152.8 million from $128.1 million in the

     prior-year quarter.

  -- Operating income rose 71.1 percent; operating profit margin improved to

     15.0 percent from 10.5 percent in the prior-year quarter.

  -- Diluted earnings per share grew 85.2 percent to $0.50.

  -- Average student population rose 17.6 percent.

  -- Student starts were essentially flat and reflected actions to raise

     outcomes.

Comment

"We produced a very strong quarter," said Shaun McAlmont, Lincoln's President and Chief Executive Officer. "Our revenue, operating income and earnings per share were all records for a second quarter.

"The current regulatory environment has created uncertainty in our sector as the Department of Education has placed a greater emphasis on regulating quality outcomes, student debt levels and overall return on educational investment. While the regulations have yet to be finalized, we believe that the Department's focus on improving outcomes is consistent with our mission of providing students with a quality education and a high return on their investment. Accordingly, we elected to raise our admission standards in the first quarter of 2010 to reduce the percentage of higher risk students in our population. While these actions contributed to starts being essentially flat in the second quarter, we believe that the increased admissions standards will assist us in achieving the Department's overall objectives by improving our graduation and placement rates while also having a positive impact on our overall population and future profitability by lowering our bad debt and default rates.

"We will continue to expand our geographic presence, add new programs, develop our online and degree initiatives and pursue strategic acquisitions. As we execute these strategies, we look forward to raising our student outcomes as well as continuing to deliver strong results to our shareholders."

Outlook

"In light of the current regulatory and economic environment, as well as our actions to reduce the percentage of higher risk students in our enrollment and to raise student outcomes, we are revising our previously issued guidance. We now believe student starts will be essentially flat for the remainder of 2010," said Mr. McAlmont. "For the full year 2010, we now expect revenue to range from $645 to $650 million and diluted earnings per share to range from $2.40 to $2.50, which would be an increase of 32 to 37 percent from the $1.82 we earned in 2009. Student starts are expected to increase approximately 4 percent for the full year.

"For the third quarter of 2010, we expect revenue to range from $165 to $170 million. Diluted earnings per share are expected to range from $0.60 to $0.65, which would be an increase of 20 to 30 percent from the $0.50 earned in the third quarter of 2009."

43.     In addition to the foregoing, Barron's online reported on August 5, 2010:

Lincoln Ed Plunges; Fear of Regulation Hits Student Enrollment Scrutiny of for-profit education is starting to hit home.

Shares of Lincoln Educational Services (LINC) are off $2.92, or 14%, at $17.70 after the company reported Q2 revenue and earnings ahead of expectations but forecast Q3 and year results well below expectations because of stricter recruitment standards.

*** 

However, the company expects student 'istarts" at its campuses will be flat the rest of the year after the company "elected to raise our admission standards in the first quarter of 2010 to reduce the percentage of higher risk students in our population."

The company had previously expected student starts to rise 13% to 15% this year.  Lincoln cut its previously forecast revenue estimate from a range of $650 million to $655 million offered back in May, to a new range of $645 million to $650 million.  Diluted earnings per share are now forecast to come in at $2.40 to $2.50, versus $2.50 to $2.60 previously.

For Q3, the company sees $165 million to $170 million in revenue, and earnings per share of 60 cents to 65 cents.  That's below the average estimate of $174 million and 66 cents.

44.     On August 10, 2010, the Company reported the following on Form 8-K:

On August 5, 2010, Lincoln Educational Services Corporation (the "Company") received a request for information from the U.S. Senate Committee on Health, Education, Labor and Pensions in connection with the Committee's review of matters related to for-profit colleges receiving Title IV student financial aid.  In its request, the Committee stated that it is seeking information and documents from the Company to more accurately understand how the Company uses Federal resources, including how it recruits and enrolls students, sets program price or tuition, determines financial aid including private or institutional loans, tracks attendance, handles withdrawal of students and return of Title IV dollars and manages compliance with the requirement that no more than 90% of revenues come from Title IV dollars. The Committee is also seeking a complete understanding of the number of students who complete or graduate from programs offered by the Company, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how the Company tracks and manages the number of students who risk default within the cohort default rate window.

The information that the Company has been requested to provide includes information relating to the Company's management, operating and financial results, amount of revenue generated from government and private financial aid, student enrollment and completion, tuition and program costs, recruiting, student loan and default management, institutional lending programs, regulatory compliance and other matters.

45.     On August 16, 2010, an article entitled "For-Profit Education On The Skids," by

Vanjan Janjigian, stated as follows:

The for-profit education industry has grown in leaps in bounds. An estimated two million students are currently enrolled in such programs. That's about 10% of all students eligible to receive federal financial aid, and that's where the problem lies.

The Department of Education is concerned that at least some for-profit educational institutions are not on the up-and-up. They may be aggressively encouraging students to enroll and borrow money to pay for tuition without offering them any real prospect of finding jobs and paying back their loans. Not unreasonably, the government wants to see evidence that former students are able to pay back their loans and are actually doing so. To be specific, to

meet the new guidelines, at least 45% of former students must be paying back principal on their loans, or the average debt burden of former students must be less than 8% of total income or 20% of discretionary income.

## CAUSATION AND ECONOMIC LOSS

46.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Lincoln's stock price and operated as a fraud or deceit on Class Period purchasers of Lincoln's stock by misrepresenting the Company's compliance with governmental regulations, operational results and foreseeable growth prospects.   Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and were apparent to investors, shares of Lincoln declined – evidence that the prior artificial inflation in the price of Lincoln's shares was eradicated.  As a result of their purchases of Lincoln stock during the Class Period, Plaintiff and other members of the Class suffered economic losses, i.e., damages under the federal securities laws.

47.     By improperly characterizing the Company's compliance, operational results and misrepresenting its prospects, the defendants presented a misleading image of Lincoln's business and future growth prospects.  During the Class Period, defendants repeatedly emphasized the ability of the Company to maintain and sustain its objectives, and consistently reported growth within the range of investors expectations and its historical range.  These claims caused and maintained the artificial inflation in Lincoln's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

48.     On August 5, 2010, however, as investors learned the truth about the Company, and realized or concluded that defendants had engaged in deceptive and manipulative recruiting that could not be maintained in the face of the federal government investigations, shares of the

Company fell about 20%. Thus, Defendants' belated disclosures had an immediate, adverse impact on the price of Lincoln shares.

49.    These belated revelations also evidenced defendants' prior falsification of Lincoln's business prospects due to defendants' false statements. As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Lincoln's share price and Plaintiff was damaged as a result of the related share price decline.

50.    As a direct result of investors learning the truth about the Company on August 5, 2010, Lincoln's stock price collapsed over 20% in the single trading day on abnormally high trading volume.

51.    The decline in Lincoln's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market. The timing and magnitude of Lincoln's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.

## ADDITIONAL SCIENTER ALLEGATIONS

52.    As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

33738v1

federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Lincoln, their control over and/or receipt and/or modification of Lincoln's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lincoln, participated in the fraudulent scheme alleged herein.

53.     Defendant Carney was motivated to make materially false and misleading statements materially because it enabled him to sell over $6 million of his privately held Lincoln shares while in possession of material adverse non-public information about the Company:

| 06/15/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,250 | 22.35 | $162,038 |
|---|---|---|---|---|---|
| 06/01/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,250 | 23.06 | $167,185 |
| 05/17/10 | CARNEY DAVID F | Officer (Executive Chairman) | 32,800 | 24.98 | $819,344 |
| 05/17/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 24.70 | $185,250 |
| 05/13/10 | CARNEY DAVID F | Officer (Executive Chairman) | 40,000 | 24.91 | $996,400 |
| 05/03/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 24.83 | $186,225 |
| 04/12/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 25.93 | $194,475 |
| 04/01/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 25.22 | $189,150 |
| 03/15/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 26.50 | $198,750 |
| 03/01/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 22.22 | $166,650 |
| 02/17/10 | CARNEY DAVID F | Officer (Executive Chairman) | 3,668 | 20.00 | $73,360 |

| 02/16/10 | CARNEY DAVID F | Officer (Executive Chairman) | 3,832 | 20.00 | $76,640 |
|---|---|---|---|---|---|
| 02/01/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 20.59 | $154,425 |
| 01/19/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 20.96 | $157,200 |
| 01/04/10 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 21.73 | $162,975 |
| 12/14/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 21.11 | $158,325 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 22.21 | $2,221 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 22.16 | $2,216 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 200 | 22.11 | $4,422 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 2,926 | 22.10 | $64,665 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 22.07 | $2,207 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 22.06 | $2,206 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 573 | 22.01 | $12,612 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 99 | 21.99 | $2,177 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 99 | 21.98 | $2,176 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 199 | 21.97 | $4,372 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 500 | 21.96 | $10,980 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 800 | 21.95 | $17,560 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 21.94 | $2,194 |

| | | | | | |
|---|---|---|---|---|---|
| | | Chairman) | | | |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 500 | 21.93 | $10,965 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 300 | 21.88 | $6,564 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 3 | 21.81 | $65 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 400 | 21.80 | $8,720 |
| 12/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 401 | 21.75 | $8,722 |
| 11/16/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 22.05 | $165,375 |
| 11/02/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 20.00 | $150,000 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 2,102 | 23.66 | $49,733 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 200 | 23.65 | $4,730 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 23.64 | $2,364 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 317 | 23.55 | $7,465 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 444 | 23.53 | $10,447 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 220 | 23.52 | $5,174 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 3,700 | 23.51 | $86,987 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 23.50 | $2,350 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 23.49 | $2,349 |
| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 100 | 23.48 | $2,348 |

33738v1

| 10/12/09 | CARNEY DAVID F | Officer (Executive Chairman) | 117 | 23.43 | $2,741 |
|---|---|---|---|---|---|
| 10/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 22.87 | $171,525 |
| 09/14/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 21.50 | $161,250 |
| 09/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 21.72 | $162,900 |
| 08/17/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 22.15 | $166,125 |
| 07/20/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 20.00 | $150,000 |
| 07/01/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 20.74 | $155,550 |
| 06/25/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 20.00 | $150,000 |
| 06/03/09 | CARNEY DAVID F | Officer (Executive Chairman) | 7,500 | 20.00 | $150,000 |

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

54.    At all relevant times, the market for Lincoln's common stock was an efficient market for the following reasons, among others:

(a)    Lincoln's stock met the requirements for listing on, and was listed and actively traded on, the Nasdaq national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Lincoln filed periodic public reports with the SEC and the Nasdaq;

(c)    Lincoln regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases

33738v1

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Lincoln was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

55.     As a result of the foregoing, the market for Lincoln securities promptly digested current information regarding Lincoln from all publicly available sources and reflected such information in Lincoln stock price.   Under these circumstances, all purchasers of Lincoln common stock during the Class Period suffered similar injury through their purchase of Lincoln common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

56.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

33738v1                                    30

and/or approved by an executive officer of Lincoln who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

57.     Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of SEC filings by Lincoln, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Lincoln's business, operations, management and the intrinsic value of Lincoln common stock; (ii) enable defendants to artificially inflate the price of Lincoln shares; (iii) enable Lincoln insiders to sell millions of dollars of their privately held Lincoln shares while in possession of material adverse non-public information about the Company; and (iv) cause Plaintiff and other members of the Class to purchase Lincoln common stock at artificially

inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

60.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Lincoln's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Lincoln as specified herein.

62.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lincoln's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Lincoln and its business operations and future prospects in the light of the circumstances under which they were made not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a

course of business which operated as a fraud and deceit upon the purchasers of Lincoln common stock during the Class Period.

63.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

64.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.   Such defendants' material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing Lincoln's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.

65.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lincoln common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices

of Lincoln's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Lincoln common stock during the Class Period at artificially high prices and were damaged thereby.

66.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Lincoln was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Lincoln common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

67.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of Lincoln within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.     As set forth above, Lincoln and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Plaintiff praysfor relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  New York, New York
   September 19, 2010

**JAN MEYER & ASSOCIATES, P.C.**


___/s/ Jan Meyer (3063)_____
Jan Meyer
1029 Teaneck Road, 2nd Floor
Teaneck, NJ  07666

**BERNSTEIN LIEBHARD LLP**
U. Seth Ottensoser
Joseph R. Seidman, Jr.
10 East 40th Street - 22nd Floor
New York, New York, 10016
(212) 779-1414

33738v1